UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

SMG, as Agent for the County of Albany, owner of the Times Union Center,

                              Plaintiffs,

v.

METROPOLITAN ENTERTAINMENT CONSULTANTS, LLC, JOHN SCHER and JOHN DOE #1, an individual, and JOHN DOE #2 INC., an entity,

                              Defendants.

COMPLAINT

Case No. 1:18-CV-1000
(BKS/CFH)

---

Plaintiff, by their attorneys, Lippes Mathias Wexler Friedman LLP, for their Complaint against Defendants respectfully shows to the Court and alleges as follows:

### NATURE OF THE ACTION

1. This is an action concerning a cancellation of a Gala Celebration Concert at the Albany Times Union Center due to a co-promoter's breach of contract, substantial and material deception and other intentional wrongdoing.

### PARTIES

2. Plaintiff SMG is a Pennsylvania general partnership which has a principal place of business in the Eastern District of Pennsylvania, is engaged on a worldwide basis in the business of arena management and is, at all relevant times, was the manager of the arena facility known as the Times Union Center in Albany, New York.

3. Defendant Metropolitan Entertainment Consultants, LLC (hereinafter "Metropolitan") is a New Jersey limited liability company, having its principal place of business within the District of New Jersey.

4. Defendant John Scher is, and was, at all relevant times, a resident of the State of New Jersey.

5. Defendants John Doe #1 and John Doe #2, Inc. (hereinafter the "Investor") are fictitious persons or entities collectively intended to designate an investor in Defendant Metropolitan, whose identity is unknown to Plaintiff at this time.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 USC §1332(a)(1) because the clauses are between citizens of different states and involves an amount in controversy in excess of $75,000.00 exclusive of interest and costs.

7. Venue is a properly set in the Northern District of New York pursuant to 28 USC §1391(b) as it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred.

## FACTS

8. County of Albany (hereinafter the "County") is a municipal subdivision of the State of New York, is the owner of a 17,000 seat arena facility known as the Times Union Center located at 51 S. Pearl Street, Albany, New York, and it is has retained Plaintiff SMG to act as its agent for all matters, financial and otherwise, in connection with the affairs of the Times Union Center since its opening in 1990.

9. The Times Union Center (hereinafter "TUC" or "the facility" or "the building") opened in 1990 with a Gala Concert featuring Frank Sinatra. The promoter for that opening Concert was John Scher.

10. The facility derives income from either renting the facility or co-promoting Concerts or other events.

11. Under a rental arrangement the TUC is paid a negotiated flat fee by the entity renting the facility and then additional income from food and beverage sales, merchandise sales

and rebates from the ticketing agency. Generally the facility retains 100% of such additional revenues.

12. In a co-promotion arrangement the TUC contributes the amount which would have been charged for rental of the facility and all of the revenue the facility would have received from the ancillary sources of income described above. The other promoter contributes the balance of the cash required to produce the event. The profits are split equally. If the show generates a net loss all of the loss is the responsibility of the other co-promoter to pay to third parties.

13. During 2017 the County had invested $20 million in renovations and upgrades to the atrium entrance area and exterior of the facility and was ready to unveil the "new look" to the public as of January 2018. It desired SMG to stage a public event to celebrate this accomplishment which was to include several major headliners performing and a black-tie reception for business and civic leaders in the atrium before the performance which would be attended by at least one of the headliners.

14. SMG and its General Manager Bob Belber (hereinafter "Belber") began, in the summer of 2017, planning the requested event. Belber reached out to Sam Feldman a well know person in the Concert promotion business who specialized in "packaging" of numerous artists for such events to assist SMG in producing the gala Concert which, after reviewing the already scheduled events, was scheduled to take place on January 26, 2018 ( hereinafter the "Concert" or the "Gala").

15. Feldman secured the participation of **James Taylor** as the featured headliner and after exploring other possibilities, secured **John Legend** as the second major entertainer for the Concert. James Taylor agreed to make an appearance at the black-tie pre-performance reception.

16. The events relating to the production of the Gala were as follows:

(a) 8/1/17 - Belber explains to Feldman he has introduced the Gala to Debra Rathwell of AEG Entertainment and John Scher of Metropolitan, two well-known promoters with whom Belber has worked in the past.

(b) 11/29/17- Belber provides Scher with a pro forma setting out the estimate of the economics of the Concert including the performance fee of $600,000 for James Taylor and $500,000 for John Legend and the allocation of the risks between the TUC and the co-promoter which limits the TUC risk, in the event the Concert is a loss, to $50,000 beyond its contribution of rent, concession and merchandizing income. Rathwell and Scher are informed agreements must be in place and deposits made by December 8th.

(c) 12/6/17 -Debra Rathwell of AEG declines participation.

(d) 12/6/17 - Belber email chain to J. Craib [of the Feldman agency] with copy to Scher stating that both Belber and Scher will sign contracts and take care of deposits. The chain also includes a prior email which states Scher has accepted the risk factors within the pro forma. There is no objection to the contents of the email chain by Scher.

(e) 12/7/17 – As a result of the demand of the agents for the performers for the advance deposits by December 8th, Belber emails Scher repeatedly seeking ½ of the required sums -- $400,000.

(f) 12/7/17 – Scher responds in a phone call with Belber that he can only provide 10% of the total deposits and he can only do so 10 days before the January 26, 2018 Concert date.

(g) 12/7/17 – Belber, in an email, informs the Feldman agency that TUC will advance the deposits.

(h)     12/8/17—Belber sends another pro forma to Scher which continues to list the limits on the TUC's liability as set forth in (b) above in the event the Concert experiences a net loss; Scher does not object.

(i)     12/8/17 – Belber creates & signs artist offer sheets for J. Taylor and J. Legend for submission to the artist's agents from which the contracts are to be prepared and submits the same for signature by Scher; Scher signs them and provides to Feldman who in turn submits them to the agents for Taylor and Legend. By such submission, under industry standards, the date is confirmed by the artist and promoters are liable for the performance fee. Scher does not, at this time request any change to the pro forma and allocation of risk.

(j)     12/8/17 – late that night Belber emails the Use License Agreement to Scher and cash advance agreements for each artist for signature and indicates he needs it signed before using TUC funds to advance the deposits which are now overdue but can be provide by noon 12/11.

(k)     12/10/17 – Scher claims his attorney is out of town and will deal with the contract on Monday (12/11)

(l)     12/11/17 (a.m.) —Scher's attorney seeks a change in an ancillary cash advance agreement; Belber consents and then wires the required deposits totaling $550,000 to the agents

(m)     12/12/17 (p.m.) – Scher's attorney telephones Belber with a demand that the TUC eliminate the limitation on its potential loss; says Scher will not do the co-promotion unless TUC is a full 50/50 partner both for profits and for losses.

(n)     12/12/17 – Belber reluctantly revises the Use License Agreement and sends to Scher who signs and returns it.

(o) 12/15/17 and 1/9/18 – formal contracts with J. Taylor and J. Legend signed.

(p) 1/17/18 – J. Taylor second deposit is due; therefore Belber sends an email to Scher demanding the agreed upon 10% of the total artists' deposit which equals $114,500.

(q) 1/17/18—Scher calls Belber and tells him:

    (i) He cannot pay the deposit

    (ii) He has no money to contribute to any loss the Concert experiences

    (iii) He has an (unnamed) investor who will not allow him to put up any money for this Concert given the lack of encouraging ticket sales

    (iv) Neither he nor Metropolitan ever had any money to invest in the Concert; all of it was to come from his investor

(r) 1/17/18 – Belber informs Feldman of Scher's failure to meet his commitment to pay his share of the deposits; informs SMG corporate officials and the County of the situation.

(s) 1/18/18 – SMG sends Scher a letter holding Metropolitan in default under the Use License Agreement

(t) 1/18 -19/18 – Feldman seeks a definitive determination if the Concert is cancelled; Belber is forced to confirm the Concert is cancelled

(u) 1/19-20/18 – Feldman and Belber attempt to save the Concert by urging the artist to take a reduced fee to perform; but not all respond in a timely manner and as of 9 p.m. on 1/20/18 the Concert is officially cancelled and a press release issued

(v) 2/13/18 – J. Taylor returns a substantial portion of the first deposit he received.

17. Plaintiffs are out of pocket **$356,881.88** in artist and agent deposits, marketing costs and printing expenses. Further Plaintiff lost the ability to rent the facility for January 26, 2018, when there was an interest in that date for a Concert event and thus suffered an additional $100,000 in lost rental and ancillary net income and other general damages established at trial.

## AS AND FOR A FIRST CLAIM

18. Repeats and re-alleges each and every allegation set forth in paragraphs 1-17 as if set forth fully herein.

19. Plaintiff SMG and Defendant Metropolitan entered into an oral agreement on December 6, 2017 to co-promote the Concert the terms of which included Defendant Metropolitan paying 50% of the artist deposits and bearing all the risk of a loss except for $50,000. The profits, after a charitable contribution to Albany Medical Center's Children's Hospital, were to be split 50% to each promoter.

20. SMG, as agent for the County and Defendant entered into a written contract titled Use License Agreement on December 12, 2017 by which said Defendant Metropolitan was to pay a rental fee of $49,000 for the use of the facility in connection with the Concert and was subject to other terms and conditions as described therein, including but not limited to those set forth in paragraph 2(b) requiring Defendant Metropolitan to bear "all loss, damages incurred in the event of a material breach of the terms of the Use License Agreement". That agreement provided that Metropolitan pay 10% of the artists required deposits.

21. Plaintiff fulfilled all of the requirements imposed upon it as co-promoter, as agent of the Owner of the TUC and Licensor under the Use License Agreement.

22. Defendant Metropolitan, aware of the obligation of a second deposit due to James Taylor on January 17, 2018 and, despite demand that it pay 10% of the total artists deposits 10 days prior to the Concert as per the provisions of the Use License Agreement, failed and refused

to provide any funds to pay its share of the deposits and further anticipatorily breached its obligation to bear no less than 50% of the losses arising from the Concert when it, through its representative Scher, stated that it had no funds which would be available to pay for any losses arising from the Concert.

23. By reason of Defendant Metropolitan's material breaches of agreements it reached with SMG as described in the immediately preceding paragraph, the Concert was cancelled and Plaintiff suffered direct losses of $356,881.88; loss of potential income in the sum of $100,000 and other general damages the amount of which are yet to be determined and will be established at trial.

24. Defendants' conduct was so willful, wanton and wrongful as to warrant an award of punitive damages in such sum as the Court may establish at the trial of this matter.

## AS AND FOR A SECOND CLAIM

25. Repeats and re-alleges each and every allegation set forth in paragraphs 1-24 as if set forth fully herein.

26. Scher and Metropolitan, in connection with the promotion of the Concert, were acting not as principals in their own right, but rather as agents for an undisclosed principal – Defendant Investor.

27. Scher and Metropolitan sought to have their principal be a co-promoter in the Concert and receive 50% of the net profit arising from a successful Concert and sought to shield their principal from liability if the Concert was an unsuccessful event by not disclosing his identity to either Plaintiff or the other third parties involved in the Concert.

28. Scher and Metropolitan did not disclose to Plaintiff: (a) the identity of their principal; (b) the resources the principal would or would not commit to the Concert and (c) under what conditions such resources would be used at the time Plaintiff accepted Scher and his company

Metropolitan as the co-promoter of the Concert on December 6, 2017 and Use Licensee on December 12, 2017.

29. Only when Scher and Metropolitan were called upon to forward artists deposits – merely 10 days before the Concert—did Scher reveal there was an investor who was to provide funds and controlled the decisions whether to honor the commitments Scher and Metropolitan had made to the Concert's promotion.

30. Defendant Investor, relying on Scher's reputation and experience in the Concert promotion industry and Metropolitan's ability to manage the logistics of Concert promotion, utilized Scher and Metropolitan as his agents in connection with the promotion of Concert events and the Concert specifically and intentionally allowed people dealing with Scher and Metropolitan to believe that Scher was the decision maker while in fact he controlled such decision making, and authorized, and at times compelled, Scher and Metropolitan to take or refuse to take certain actions and withhold material information from those with whom Scher and Metropolitan were dealing in connection with the promotion of the Concert.

31. Plaintiff was damaged by the wrongful acts of Defendants described in its SECOND claim.

32. By reason of the foregoing Defendant Scher is personally liable for the agreements made on behalf of his undisclosed principal and the damages arising from the directions of his principal to breach those agreements.

33. By reason of the foregoing Defendant Investor is personally liable for the agreements made by his agents at his direction and the damages arising from his directions to breach those agreements carried out by his authorized agents.

34. The actions of Defendants were so grossly willful wanton and involved a high degree of moral culpability as to warrant the imposition of punitive damages in such amount as the Court shall determine at the trial of this matter.

### AS AND FOR A THIRD CLAIM

35. Repeat and re-allege each and every allegation set forth in paragraphs 1-34 as if set forth fully herein.

36. Defendant Investor was an undisclosed partner of the Concert promotion business conducted by Defendant Scher through his company Metropolitan, with respect to the promotion of the Concert, in which Scher was to contribute his contacts, reputation and skills to the joint venture, Metropolitan was to contribute organizational and logistical support required of a co-promoter and Investor was to provide the fiscal resources, if called upon, to support the obligations of a co-promoter of the Concert.

37. Defendants Metropolitan, Scher and Investor, together constitute a joint venture to engage in the business the promotion of the Concert.

38. Defendant Investor authorized, and at times compelled, Defendant Scher's actions, representations and material omissions in connection with the Concert on behalf of the joint venture.

39. Defendant Scher, as the representative of the joint venture failed to disclose to the persons with whom it was dealing the existence of the joint venture and that neither Scher nor Metropolitan were the decision-makers of the joint venture with respect to financial matters and did not have the financial resources to meet the obligations of a co-promoter of the Concert on their own.

40. The joint venture has engaged in wrongful conduct directed at Plaintiff as described in the claims set forth in this Complaint, including but not limited to, failing to disclose the

participation of the Investor, changing the terms of the oral agreement to co-promote the Concert when it was too late to seek a more financially responsible co-promoter and failing to honor the limited commitment it had made to advance artists' deposits 10 days before the Concert, directly causing the cancellation of the Concert.

41. As a result of such wrongful actions each member of said joint venture is liable, jointly and severally, to Plaintiff for the damages as alleged in such claims described in this Complaint.

## AS AND FOR A FOURTH CLAIM

42. Repeat and re-alleges each and every allegation set forth in paragraph 1-41 as if set forth fully herein.

43. Belber, on SMG's behalf, provided Scher with clear written statements of what was expected of Scher and his company in the form of proformas and copies of emails to others involved in the Concert.

44. Scher orally agreed to the terms of the proformas as forming the basis of the co-promotion agreement between Metropolitan and SMG and did not object to Belber's recitation of such agreement in Belber's emails to Feldman and the management of the performers.

45. Scher signed the artists' deal sheets prepared by Belber on Plaintiff's behalf and acquiesced in their submission to artist management knowing that, within industry norms, would constitute a binding commitment of the promoters.

46. Defendant Scher represented to Belber as Plaintiff's representative that he and his company Metropolitan could act as a co-promoter of the Concert and fulfill all the duties of a promoter as he and Belber understood the industry's requirements, including but not limited to, paying the appropriate share of artists' required deposits on a timely basis without the consent or involvement of another.

47. Belber had no knowledge, at the time of oral agreement described above, of Scher's and Metropolitan's true intentions, and true financial resources and the involvement and control of Defendant Investor in the promotion of the Concert.

48. Belber, based on 20+ years of close professional friendship and the successful co-promotion of other Concerts with Scher, believed in and relied upon Scher's integrity and word that he would and could act as co-promoter without restrictions in moving forward with the Concert planning and execution.

49. By such misrepresentations and concealment, Plaintiff was fraudulently induced into having Metropolitan act as co-promoter of the Concert.

50. Only when the artists' management pressed Belber for the deposits on December 7th did Scher for the first time reveal that he and his company could only advance 10% of the total artists' deposits and could do so only 10 days before the Concert.

51. Defendant Scher further delayed signing the Use License Agreement during the period December 8-11, 2017 when the artists' agents were demanding the first deposits or risk having the show cancelled so that Plaintiff would be forced not only to advance 100% of the deposit of $550,000, but also agree to his demanded changes to the written agreement to change the TUC's potential exposure to liability in the event of a loss.

52. After the written Use License Agreement was revised as per his demands and signed, Scher made additional misrepresentations and omitted to reveal material information to SMG as it co-promoter as the agent for the TUC and its owner the County of Albany, including but not limited to the fact that neither he nor his company Metropolitan had the financial resources to act as co-promoter of the Concert, or to meet Metropolitan's obligations, even as reduced, without the consent and participation of another unnamed person or entity who was an investor in Metropolitan.

53. Scher intended to deceive Belber and the Plaintiff into allowing Metropolitan to act as co-promoter by his affirmative representations and his material omissions of key information so as to allow the Concert to develop into a profitable event and have Defendants receive 50% of the net profits.

54. When ticket sales as of January 17, 2018 were not adequate to assure a profitable show and Metropolitan was required to provide Plaintiff with $114,500 of funds to be used to fund, in part, James Taylor's second deposit, Scher revealed for the first time that neither he nor Metropolitan had any funds to use toward the obligation; that all funding decisions were made by his unnamed investor and that such investor had informed him that he would not put any money into the show given the poor ticket sales.

55. Some of such misrepresentations and concealment of relevant existing facts were made after the formation of the contract.

56. If Plaintiff had known the true state of Scher and Metropolitan's financial situation Scher and his company would not have been solicited as a co-promoter and if such facts had been revealed at the time of the commitments made in mid-December or shortly thereafter Scher and Metropolitan would have been terminated and a replacement promoter secured in time to allow the Concert to be produced.

57. Plaintiff suffered damages arising from Defendants' fraud in that the Concert was cancelled less than a week before the scheduled date, artist and agents' deposits were forfeited, the building sat empty on a date which was otherwise rentable and would have yielded net operating income, and Plaintiff SMG spent an enormous amount of staff time to produce a show that could not be presented.

58.     Defendant Investor authorized, and in fact compelled, Defendant Scher to engage in the conduct described herein and is thereby liable to Plaintiff for such damages as arise from the wrongful and deceptive actions and omissions set forth in this claim.

59.     The conduct of Defendants displayed a high level of moral culpability and was so willful, wanton and deceptive, and by the necessary result thereof caused the cancellation of the Concert, thereby warranting the imposition of punitive damages in such sum as the Court shall establish upon the trial of the matter

## AS AND FOR A FIFTH CLAIM

60.     Repeat and re-allege each and every allegation set forth in paragraphs 1-59 as if set forth fully herein.

61.     Defendant Scher incurred an obligation under the oral agreement to be a co-promoter of the Concert to pay 50% of the artists' deposits and bear all losses above $50,000 that an unsuccessful Concert might generate.

62.     Defendant Metropolitan incurred an obligation under the written Use License Agreement to pay 10% of the artists' deposits' and to bear 50% of any loss the Concert might generate.

63.     At the time that these obligations were incurred Defendants Scher and Metropolitan were, or would be thereby, rendered insolvent and Scher acknowledged that fact to Belber in a January 17, 2018 telephone conversation.

64.     The incurring of the obligations under the oral agreement to act as a co-promoter of the Concert and under the Use License Agreement was made without fair consideration under Article 10 of New York's Debtor and Creditor Law in that it lacked good faith due to Scher and Metropolitan's knowledge that they, as the named obligors under the oral agreement to act as co-promoter of the Concert and the Use License Agreement had no financial ability to meet their

obligations and sought to foist the deposit obligations onto Plaintiff at a time when they knew Plaintiff would have no choice but to acquiesce if it wanted to save the Concert from cancellation. Such ploy worked with the first deposit requirement under the oral co-promotion agreement but ultimately did not work with the second deposit.

65. The obtaining of the potential to earn net profit from the Concert in exchange for the incurring of the obligations of the oral co-promotion and written Use License Agreement was made without fair consideration under Article 10 of New York's Debtor and Creditor Law in that Defendant Scher and Metropolitan did not provide a fair equivalent of value in that they had no financial ability to meet their obligations and thus their promises were illusory obligations of no economic value to Plaintiff who was left as the sole economically viable promoter of the Concert.

66. Such conduct in incurring such debts and engaging in a business transaction with insufficient capital is a violation of NY Debtor and Creditor Law Sections 273 and 275 as constructively fraudulent without regard to intent.

67. Defendant Investor aided and abetted the violation of Debtor and Creditor Law Sections 273 and 275 by Defendants Scher and Metropolitan, without regard to intent.

68. Plaintiff suffered economic damages as described in paragraph 17 arising from the Defendants' violation of Debtor and Creditor Law 273 and 275.

69. Defendants conduct was so willful, wanton and involved a high degree of moral culpability so as to warrant the imposition of punitive damages in such amount as is determined by the Court at the trial of this matter.

## AS AND FOR A SIXTH CLAIM

70. Repeat and reallege each and every allegation set forth in paragraphs 1-69 as if set forth fully herein.

71. Defendants Scher and Metropolitan incurred the obligations of co-promoter of the Concert under the oral agreement and under the written Use License Agreement with an actual intent to hinder, delay or defraud creditors and specifically Plaintiff and third parties who performed services, furnished goods, advanced monies or gave up other economic opportunities in connection with the Concert events and the Concert date of January 26, 2018.

72. Defendants' actual intent to hinder, delay or defraud is evidenced by (a) the deliberate failure to disclose the role of Defendant Investor; (b) signing artist offer sheets knowing it was based on a proforma in which they were to bear most of the risk of loss in the event of an unprofitable Concert when they had no intention to honor such terms and allowing them to be submitted to artists' management thereby binding, under industry norms, the promoters to produce the Concert (c) delaying the signing of the Use License Agreement in mid-December and not proposing changes in the level of deposits to be supplied by them until a time when Plaintiff would have to bear their burden to ensure the Concert could be announced at a previously scheduled public event; (d) not disclosing that the Investor would not provide the required funds to Plaintiff to fund the second deposit requirement until January 17, 2018.

73. The conduct of Defendants Scher and Metropolitan violate New York's Debtor and Creditor Law Section 276

74. Defendant Investor aided and abetted the violation of Debtor and Creditor Law Section 276.

75. Plaintiff suffered economic damages as described in paragraph 17 arising from the violation of Debtor and Creditor Law Section 276.

76. Defendants' conduct was so grossly willful, wanton and bore a high level of moral culpability as to warrant the imposition of punitive damages as determined by the Court at the trial of this matter.

77. Plaintiff is entitled to recover attorneys' fees incurred as a result of Defendants' violation of Debtor and Creditor Law Section 276.

WHEREFORE, Plaintiff demands Judgment against Defendants and each of them in the amount of $456,881.88, plus general damages to be determined at trial, punitive damages and attorneys' fees as determined by the Court, together with the costs and disbursements of the action and such other and further relief as to the Court may seem just and proper.

Dated: August 21, 2018

LIPPES MATHIAS WEXLER FRIEDMAN, LLC

By: *Robert E. Ganz*
Robert E. Ganz
Bar Roll No. 101741
Attorneys for Plaintiff
One Columbia Circle
Albany, New York 12203
(518) 869-9500
rganz@lippes.com

## PLAINTIFF DEMANDS TRIAL BY JURY OF ALL ISSUES