**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
―――――――――――――――――――――――――――――

SMG, as Agent for the County of Albany,
Owner of the Times Union Center,

1:18-cv-1000 (NAM/CFH)

                             Plaintiff,

v.

METROPOLITAN ENTERTAINMENT
CONSULTANTS, LLC; JOHN SCHER; and
JOHN DOE #1, an individual; and JOHN DOE #2 INC., an
entity,

                             Defendants.
―――――――――――――――――――――――――――――

**Appearances:**

*For Plaintiff:*
ROBERT E. GANZ, ESQ.
Lippes Mathias Wexler Friedman LLP
54 State Street, Ste. 1001
Albany, New York 12207

*For Defendants:*
ROBERT J. PEARL, ESQ.
BENJAMIN CASILIO, ESQ.
The Pearl Law Firm, P.A.
1163 Pittsford-Victor Road, Ste. 150
Pittsford, New York 14534

**Hon. Norman A. Mordue, Senior United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.     INTRODUCTION

This diversity action arises from the cancellation of a concert at the Times Union Center

in Albany, New York in January of 2018.  (Dkt. No. 1).  Plaintiff SMG, as manager of the Times

Union Center, brings several claims sounding in breach of contract and fraud against Defendants

Metropolitan Entertainment Consultants, LLC ("Metropolitan") and John Scher, with whom

SMG organized and promoted the concert.  (*Id.*).  Now before the Court are several motions: 1) Defendants' Motion for Judgment on the Pleadings, or alternatively, for Summary Judgment (Dkt. No. 37); 2) Plaintiff's Cross-Motion for Partial Summary Judgment (Dkt. No. 39); and 3) Defendants' Motion for Sanctions (Dkt. No. 48).[1]

## II.   BACKGROUND

### A.  Record Before the Court

As an initial matter, although Defendants have moved for judgment on the pleadings, they have submitted a swath of supporting exhibits.  When matters outside the pleadings are presented on a motion under Rule 12(c), the Court has two options: "exclude the additional material or convert the motion to one for summary judgment."  *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 214 (2d Cir. 2020) (citing Fed. R. Civ. P. 12(d)).  Because Defendants have moved in the alternative for summary judgment, and Plaintiff has done the same, the Court will review the entire record and evaluate the motions under the standard for summary judgment.

The facts herein have been drawn from the parties' statements of material facts, their responses, and the attached exhibits, depositions, and affidavits to the extent that they would be admissible as evidence.  Undisputed material facts supported by the record are taken from the moving party's statement of material facts, whereas disputed material facts supported by the record are taken from the nonmoving party's submissions.  Where facts stated in a party's statement of material facts are supported by testimonial or documentary evidence and denied with only a conclusory statement by the other party or not denied at all, the Court has found such facts to be true.  *See* L.R. 7.1(a)(3); Fed. R. Civ. P. 56(e).

---

[1] This case was reassigned to the Hon. Norman A. Mordue on October 23, 2020.  (Dkt. No. 52).

### B.  Facts

In 2016 and 2017, the County of Albany undertook a major renovation of the Times Union Center in Albany, New York.  (Dkt. No. 53, ¶ 6).  The Times Union Center is operated by a private management company, Plaintiff SMG, of which Bob Belber is the General Manager. (*Id.*, ¶¶ 1, 3).  In early 2017, the County asked Belber to plan a concert to celebrate the newly renovated Times Union Center.  (*Id.*, ¶ 7).  To put together the concert, the County and SMG brought in a co-promoter, John Scher of Metropolitan.  (*Id.*, ¶¶ 7, 9).  SMG and Metropolitan reached an oral agreement to serve as co-promoters of the concert.  (Dkt. No. 37-2, ¶ 1). Plaintiff alleges that the terms of the oral agreement included Metropolitan paying 50% of the artist deposits and bearing all the risk of loss except for $50,000, with the profits to be split 50/50 between the parties.  (Dkt. No. 1, ¶ 19).

On December 8, 2017, SMG and Metropolitan entered into a formal License Agreement ("the License Agreement") for use of the Times Union Center to host The Re-Opening Gala Celebration ("the Concert") on January 26, 2018.  (Dkt. No. 38-13).  In consideration for the grant of license, Metropolitan agreed to pay SMG a license fee, a merchandising fee, reimbursable service expenses, and "10% of the artist guarantees in the form of an advance deposit payable to [SMG]."  (*Id.*, pp. 4, 14).  The License Agreement stated that "[a]rtist contracts are being entered into by both parties to contract for the appearances of James Taylor, John Legend and two other artists at the Times Union Center as part of the Re-Opening Gala Celebration Concert."  (*Id.*, p. 14).  The parties also agreed that they would "equally co-promote this event and will split any profits or losses 50/50 up or down."  (*Id.*, p. 15).  Belber later wrote that Scher forced him into a last-minute agreement to this split instead of the $50,000 cap on losses for SMG.  (Dkt. No. 37-22, p. 2).

The License Agreement also contained a provision which stated that Metropolitan, the Licensee, would be in default if any of the following events occurred:

1) Licensee fails to pay any amount due hereunder (including, without limitation, the Licensee Fee or the Reimbursable Service Expenses) when the same are required to be paid; or

2) Licensee or any of its officers, directors, employees or agents fails to perform or fulfill any other material term, covenant, or condition contained in this Agreement and Licensee fails to commence a cure thereof within five (5) business days after Licensee has been served with written notice of such default.

(Dkt. No. 38-13, p. 7). SMG as the Licensor would be considered in default if it failed to perform or fulfill any term, covenant, or condition contained in the License Agreement and failed to commence a cure thereof within five business days after SMG had been served with written notice of such default. (*Id.*). Furthermore, the License Agreement stated that upon a default by either party, "the nonbreaching party may, at its option, upon written notice or demand upon the other party, cancel and terminate the license granted . . . and the obligations of the parties with respect thereto." (*Id.*). The License Agreement was signed by Bob Belber on behalf of SMG and John Scher on behalf of Metropolitan. (*Id.*, p. 11).

Belber and Scher ultimately agreed to book James Taylor and John Legend for the Concert; James Taylor agreed to a fee of $600,000, John Legend agreed to $500,000, and both artists required 50% deposits upfront before the concert. (Dkt. Nos. 38-14, 38-15). The artist agreements were signed by Belber and Scher. (Dkt. Nos. 38-14, 38-15). James Taylor was represented in these negotiations by his manager Samuel Feldman; John Branigan represented John Legend. (*Id.*). For Taylor's agreement, $300,000 was due on December 11, 2017, with the balance due on January 17, 2018. (Dkt. No. 38-14, p. 4). For Legend's agreement, $250,000 was due on December 13, 2017, with the balance due the day of the Concert. (Dkt. No. 38-15, pp. 4–6). They also agreed to hire Real Men Star James Belushi as Master of Ceremonies for

4

$40,000 and local singer Moriah Formica as the opener for $5,000.  (Dkt. No. 37-22, p. 2).
Thus, the total artist guarantees amounted to $1,145,000.

SMG paid the advance deposits to Taylor and Legend, and tickets for the Concert went
on sale with prices ranging from $65 to $195.  (Dkt. No. 38-14, p. 2).  On January 16, 2018,
Belber emailed Feldman that the Concert was facing a "staggering loss."  (Dkt. No. 37-4, p. 2).
Belber blamed the poor ticket sales on the high ticket prices required to pay the artists, and he
asked Feldman to assist in lowering the artists' fees.  (*Id.*).  That same day, Scher emailed Belber
that: "As I have told you from the beginning, we have no ability to pay deposits until 10 days
before the show and then only 10%.  We both realize that this is a disaster, but I was upfront
about our financial ability.  You have received the gross sales from Ticketmaster which should
cover the remaining deposits."  (Dkt. No. 38-28, p. 3).  Belber replied that "[t]he balance of the
James Taylor guarantee should be paid from your side since we already paid out $550K."  (*Id.*).
Belber continued:

> I really need you to come up with funds to cover this expense.  The date of the
> event is January 26, 2018.  January 17th is nine days in advance of the event date.
> You should be able to come up with these funds.  If you were to pay 10% of the
> guarantees it would be around $114,500 based on talent guarantees of over
> $1,145,000.  Normally in a full 50/50 partnership each party would come up with
> half of the deposits.  I am not even asking you to pay half.  Just pay the $300K to
> CAA and then we will see where things end up on the night of the event.

(*Id.*).

On January 17, 2018, Belber emailed Scher again asking him to confirm: 1) "Whether
you will pay the final amount owed to James Taylor, which is $300K and is owed today"; and 2)
"Whether you will pay your half of the loss sustained from this event on the night of the show or
at least immediately upon the final settlement for the show."  (Dkt. No. 38-28, p. 2).  According
to Belber, Scher "failed and refused to make such payment or acknowledge his responsibility for
50% of the loss."  (Dkt. No. 53, ¶ 12(d)).  Belber states when he asked Scher for the deposits on

January 17, 2018, Scher's response was: "for the very first time, that he had an unnamed investor in his business who controlled his decision making and that there would be no money further advanced for deposits and no ability or willingness to bear 50% of the loss if the concert went forward and was not profitable."  (Dkt. No. 49-1, ¶ 3).

In Belber's view, Metropolitan (through Scher) had breached the License Agreement by not paying the advance deposit "and thus the concert was necessarily cancelled."  (Dkt. No. 53, ¶ 12(e)).  Belber states that "[a]ll efforts thereafter were loss mitigation efforts in which I, on behalf of both SMG and Albany County, did everything we could to reduce the amount of the loss which we were facing under the artists' contracts."  (*Id.*, ¶ 12(f)).

Later that day, Belber emailed colleagues at SMG that the "Gala Celebration is a bust." (Dkt. No. 37-22).  He reported that only $511,020 in tickets had been sold, whereas the overall budget of the show was $1,250,000.  (*Id.*).  And $300,000 was currently due to Taylor.  (*Id.*). Belber said that Scher had failed to send $114,500, "which represents 10% of the artist guarantees and he said he cannot send it because he doesn't have the money to do so."  (*Id.*, p. 3).  Belber claimed that Scher told him that he could not "cover his [Scher's] half of a major loss that this event will result in," and that Scher asked him to cancel the concert.  (*Id.*).

Feldman testified that on January 18, 2018, Belber called to inform him that he was cancelling the Concert.  (Dkt. No. 37-11, p. 2).  The next morning, Belber put it in writing to Feldman: "Please be advised that it is impossible for the performance scheduled to occur on January 26, 2018 at the Times Union Center to proceed, due to the termination for default of Metropolitan Entertainment Consultants LCC's license to use the premises."  (Dkt. No. 37-12).

On January 19, 2018, Belber wrote a letter to Scher stating that "due to your payment default, the Use License Agreement by and between SMG and Metropolitan Entertainment

Consultants LLC ('Licensee') dated December 8, 2017 (the 'Use License Agreement') is terminated effective immediately."  (Dkt. No. 38-16).  Belber continued:

> As you know, Licensee was obligated under Exhibit B, Section 2(b), to pay an advance deposit equal to 10% of the artist guarantees.  With the event scheduled to occur on January 26, 2018, demand was made on Licensee on January 17, 2018 for payment of the deposit, in the amount of $114,500.  Upon receipt of the demand, Licensee advised General Manager Bob Belber that 'you did not have any money to pay the deposit' and would not pay the deposit.  This constitutes a repudiation of the obligation to make payment and a default under Section 11(a)(i). Accordingly, the Use License Agreement is terminated as a consequence of your default.

(Dkt. No. 38-16).  Belber also advised Feldman of the cancellation.  (Dkt. No. 37-12).

But later in the day, Feldman told Belber that Taylor might agree to a lower fee so as not to disappoint his fans; Belber wrote an email to Scher, Branigan, and others that: "I received word just now from Sam Feldman and he said that he would like to see everyone stand by for a bit due to his discussion with James Taylor who would be willing to greatly reduce his fee. Feldman is asking other artists to also help save this show by reducing their fees greatly and Sam has asked me to come back to him with numbers that can allow this show [to] still happen." (Dkt. No. 38-21).  Belber asked Scher to contribute $100,000 and for Legend to accept a smaller fee as well.  (*Id.*).  Belber told Feldman that he would need everyone to respond by January 20th "to make this work."  (Dkt. No. 37-13, p. 3).

On January 20, 2018, Belber exchanged emails with Feldman about re-negotiating Taylor's deal.  (Dkt. No. 37-13, pp. 1–2).  Feldman also asked Scher if he was willing to put up $100,000 and Scher agreed.  (Dkt. No. 37-14).  Scher informed the group that he would "stand by [his] $100,000 commitment, once we resolve the total package."  (Dkt. No. 37-15).

At 2:46 p.m., Feldman stated that Taylor would accept the reduced offer "as long as the show is intact with the other artists performing, most importantly John Legend."  (Dkt. No. 37-

16).  At 3:13 p.m., there was still no word from Legend's camp, and Feldman suggested that "if we hear nothing it must be perceived as a pass and for good of all press release must go at 4." (*Id.*).  Belber wrote that "the County and SMG would like to see this show happen.  Whatever you can do to get Legend to confirm would be appreciated.  The 4pm deadline may have a very small variable of time 15-30 minutes.  But not much.  Come 4:30 the release is going out, I will call Branigan as well."  (*Id.*).  Feldman agreed to the deadline.  (*Id.*).  Belber emailed Feldman that he spoke with Branigan and "told him we have to hear by 4:30 as the drop dead deadline or the County has asked us to send out the release that explains the cancellation."  (*Id.*).

The deadline passed, but sometime shortly thereafter, Legend agreed to a reduced fee, and Belber asked Feldman to once again talk to Taylor about going forward with the Concert. (Dkt. No. 37-18, p. 3).  Feldman declined, replying that: "you have cancelled this date twice now and it remains as such."  (*Id.*).  Feldman later testified that he did not go back to Taylor after Legend finally agreed because he had already communicated to his partners and production team that the Concert was cancelled.  (Dkt. No. 37-13, p. 3).  Feldman also believed that due to the missteps, apparent "fabrications," and conflicts leading up to the Concert, Taylor would not come out unscathed.  (*Id.*, p. 2).  Feldman explained that he had been led to believe that the Concert was fully financed, whereas it turned out that SMG needed a co-promoter to come up with money.  (Dkt. No. 48-7, p. 2).

The next day, SMG put out a press release stating that: "Due to unforeseen circumstances involving the promoter of the show, it is impossible for the performance scheduled to occur on January 26, 2018 at the Times Union Center to proceed."  (Dkt. No. 37-21, p. 5).

## III.   STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim").

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).  Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)). Upon cross-motions for summary judgment, the Court must "in each case constru[e] the evidence in the light most favorable to the nonmoving party." *Krauss v. Oxford Health Plans, Inc.*, 517 F.3d 614, 621–22 (2d Cir. 2008) (citation omitted).

## IV.   DISCUSSION

As an initial matter, Plaintiff's claims can be divided as follows: 1) breach of contract under New York law (First Claim) against Defendant Metropolitan; 2) fraudulent inducement (Claims Two, Three, and Four) against Defendants Metropolitan and Scher; and 3) violation of New York Debtor & Creditor Law §§ 273, 275, 276 (Claims Five and Six).  (Dkt. No. 1).  The heart of this case is an alleged breach of contract, and the Court will begin there.

### A.  Breach of Contract

In essence, SMG alleges that Metropolitan breached the License Agreement by failing to pay its portion of the artist guarantees in advance, a sum of $114,500, thus causing the cancellation of the Concert.  (Dkt. No. 1).  However, Defendants argue that this theory is "demonstrably false" because the parties agreed to revised terms that allowed the Concert to go forward, and then Plaintiff "unilaterally" cancelled the concert.  (Dkt. No. 37-3, pp. 14–15). Defendants point to emails where Belber asked Scher to come up with $100,000 as they worked to lower the artist fees, and Scher promised to do so once they resolved "the total package." (Dkt. Nos. 37-13, 37-15, 38-21).  In legal terms, Defendants contend that there was a novation which effectively replaced the License Agreement.  (Dkt. No. 37-3, pp. 14–15).

In response, Plaintiff argues among other things that Belber did not intend the $100,000 to extinguish the License Agreement and obviate Metropolitan's obligation to bear 50% of any loss from the Concert.  (Dkt. No. 38-2, p. 14).  According to Plaintiff, the undisputed facts show

that Metropolitan breached the License Agreement by failing to pay the advance deposit on the artist guarantees.  (*Id.*, p. 6).  Plaintiff contends that SMG then necessarily terminated the License Agreement and tried to mitigate its losses by scrambling "to save the concert on changed terms with the artists."  (*Id.*).

Under New York law, the elements of a breach of contract claim are: "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).[2] The existence of a novation—a new substitute contract—is a defense for a breach of contract claim because it discharges the obligations in the original contract.  *See* WILLISTON ON CONTRACTS § 76:2 (4th ed. 2020).  When there is an alleged novation, four elements must be shown: "(1) a previously valid obligation; (2) agreement of all parties to a new contract; (3) extinguishment of the old contract; and (4) a valid new contract."  *In re Balfour MacLaine Intern. Ltd.*, 85 F.3d 68, 82–83 (2d Cir. 1996) (internal quotations and citations omitted); *see also Holland v. Fahnestock & Co., Inc.*, 210 F.R.D. 487, 490 (S.D.N.Y. 2002) ("to establish a novation, there must be a clear and definite intention on the part of all the concerned parties that such is the purpose of the agreement").  "[T]he party asserting the novation's existence has the burden of proving that the subsequent agreement was intended as a complete substitute for the parties' prior agreements."  *In re Cohen*, 422 B.R. 350, 373 (E.D.N.Y. 2010).

In this case, there is no dispute that the parties entered the License Agreement, a valid contract which imposed obligations on Metropolitan including the payment of "10% of the artist guarantees in the form of an advance deposit payable to [SMG]."  (Dkt. No. 38-13, pp. 4, 14). The record shows that they also agreed to artist guarantees in the amount of $1,145,000, that

---

[2] There is no dispute that New York law applies in this case.  (*See* Dkt. No. 38-13, p. 9).

SMG paid advances of $300,000 to Taylor and $250,000 to Legend, and that a further $300,000 was due to Taylor on January 17, 2018. (Dkt. Nos. 38-14, 38-15). According to Belber, on January 16th and 17th, he asked Scher for Metropolitan to pay the 10% advance deposit— $114,500—and Scher failed and refused. (Dkt. No. 53, ¶ 12(d)). Scher has not submitted any testimonial evidence to counter this allegation. But the record shows that Scher emailed Belber on January 16, 2018 and stated that: "As I have told you from the beginning, we have no ability to pay deposits until 10 days before the show." (Dkt. No. 38-28, p. 3). In response, Belber reminded Scher that the Concert was nine days from January 17th and that "[i]f you were to pay 10% of the guarantees it would be around $114,500." (*Id.*). Belber states that he demanded the deposits again on January 17, 2018, and Scher said that "there would be no money further advanced for deposits." (Dkt. No. 49-1, ¶ 3).

Defendants point out that the License Agreement "does not specify any date on which this deposit must be made." (Dkt. No. 42, p. 9). Defendants argue that Metropolitan could have paid Plaintiff out of proceeds from the Concert—until SMG cancelled it. (*Id.*, p. 8). However, the License Agreement referred to an "advance deposit," not a later reimbursement. (Dkt. No. 38-13, p. 14). And Scher reflected this understanding when he referred to paying deposits 10 days before the Concert. (Dkt. No. 38-28, p. 3). It would also have been illogical for SMG, a 50/50 partner with Metropolitan, to pay *all* of the deposits by itself before the Concert. Ultimately, there is no dispute that Metropolitan failed to pay the 10% advance deposit by January 17, 2018—nine days before the Concert. That constituted a clear default of the License Agreement, and on January 19, 2018, Belber informed Scher of the default and termination of the contract. (Dkt. No. 38-13, p. 7; Dkt. No. 38-16). Based on these undisputed facts, the Court finds as a matter of law that Metropolitan breached the License Agreement.

To the extent Defendants argue that a novation of License Agreement discharged Metropolitan's obligation to pay the advance deposit, they are off-key. The claimed novation—a tentative agreement for Scher to pay $100,000 as part of a renegotiated deal with the artists—was never fleshed out by the parties, much less expressly agreed upon as a complete substitute for the License Agreement. Indeed, Scher merely offered to put up $100,000 "once we resolve the total package." (Dkt. No. 37-15). That package was never resolved. Rather, the record shows that the parties scrambled to save the Concert with last-minute emails, *after* Metropolitan breached the License Agreement, with only the loosest of frameworks for going forward. (Dkt. Nos. 37-13, 37-14, 37-15, 38-21, 38-23). For example, Belber wrote on January 19, 2018 that "I think I can get my people to consider going forward" *if* Taylor agreed to $200,000, Legend agreed to $300,000, and Scher put up $100,000. (Dkt. No. 38-23, p. 2). Belber added that "SMG will be looking for signed amendments to the artist agreements." (*Id.*, p. 3). But there is no evidence that the artists inked a new deal. Instead, Taylor informally agreed to a reduced fee, contingent on an "intact" Concert with Legend, who was largely absent from the discussion. Without a firm commitment from the artists, a new contract was purely hypothetical.

Moreover, in all the emails between Belber and Scher, there is no clear reference to the License Agreement, amending it, or replacing it with a new contract. There is no reference to the 50/50 up or down split previously agreed to by the parties—a contentious issue that threatened huge losses for both sides. And there is no indication that a new written contract was ever composed, circulated, or signed to substitute for the License Agreement—which itself contained a broad merger clause about the extent of the parties' agreements and obligations. (Dkt. No. 38-13, p. 10). According to Belber, he viewed Scher's $100,000 commitment as an effort to move forward, not a new agreement. (Dkt. No. 53, ¶ 17).

13

Based on these facts, no reasonable jury could conclude that the parties agreed to a novation in place of the License Agreement. Even assuming that was Scher's intention, the record shows that the parties never formed a new, valid contract that replaced the old one. Simply put, the emails cannot be reasonably read to infer that Belber and Scher agreed to extinguish the License Agreement and stand in its place a vague commitment from Scher to pay $100,000, with the artist guarantees unresolved, and without any discussion of the 50/50 split. Therefore, Defendants have failed to raise an issue of fact that a novation occurred. *See Raymond v. Marks*, 116 F.3d 466, 466 (2d Cir. 1997) ("novation requires the consent of all parties to substitute one obligation or agreement for another"); *see also Lloyds Bank PLC v. Republic of Ecuador*, 96 Civ. 1789, 1998 WL 118170, at *10, 1998 U.S. Dist. LEXIS 3065, at *32 (S.D.N.Y. Mar. 16, 1998) ("If the parties had intended to extinguish all rights and obligations under the Consolidation Agreement, surely they would have provided some indication that that was their intent."). Because there was no novation, the License Agreement remained the operative contract, and Metropolitan breached it by not paying the advance deposit.

As to damages, Defendants argue that the Concert was cancelled due to Plaintiff's "unilateral conduct," not any breach, and therefore "the magnitude of losses are unknowable." (Dkt. No. 37-3, p. 11). According to Defendants, "there was no barrier to the Concert going forward, other than the decision of Feldman that he would no longer consider his client participating in light of Plaintiff's conduct" in repeatedly renegotiating and cancelling the Concert. (*Id.*). In response, Plaintiff has adduced evidence that it suffered losses of $356,881.88 related to the cancelled Concert. (Dkt. No. 38-5, p. 4; Dkt. No. 38-11, p. 6; Dkt. No. 53, ¶ 21). Ultimately, Plaintiff must prove that Metropolitan's breach of the License Agreement "proximately caused the damages, or that the damages likely resulted from the breach of

contract." 24 WILLISTON ON CONTRACTS § 64:12 (4th ed. 2020).  But based on the record, a

reasonable jury could conclude that it was Metropolitan's breach that triggered Belber's

desperate efforts to renegotiate and resurrect the Concert, which then scared off Feldman and

finally brought down the curtain.  This sequence of causation, cancellation, and damages will

have to be proven and decided at trial.  Accordingly, summary judgment is not warranted on

Plaintiff's breach of contract claim.  *See Lexington Products Ltd. v. B. D. Commun., Inc.*, 677

F.2d 251, 253 (2d Cir. 1982) (observing that courts applying New York law "do not require

scientific rigor in the calculation of damages"); *Tenor Opportunity Master Fund, Ltd. v. Oxygen

Biotherapeutics, Inc.*, 11 Civ. 06067, 2012 WL 2849384, at \*10, 2012 U.S. Dist. LEXIS 96250,

at \*25–26 (S.D.N.Y. July 11, 2012) (finding that because the plaintiff "raised a triable issue of

fact as to the *amount* of damages it sustained—*i.e.,* proved that it did sustain some damages

sufficient to meet the fourth element of a breach of contract action—the question of damages

must be presented to a jury for final determination").

## B.  Fraudulent Inducement

Plaintiff also alleges that Metropolitan and Scher fraudulently induced it to agree to co-

promote the Concert by failing to disclose an unnamed investor and making misrepresentations

about Metropolitan's ability to finance the Concert.  (Dkt. No. 1, ¶¶ 25–59).  Plaintiff cites two

John Doe Defendants in place of the unnamed investor.  (*Id.*, ¶ 5).  In support of summary

judgment, Defendants argue that Plaintiff cannot bring parallel fraud and contract claims based

on the same allegations, and that Plaintiff's theory of fraud is "demonstrably untrue" because

Metropolitan had ample resources to cover the $114,500 advance deposit.  (Dkt. No. 37-3, pp.

15–17; Dkt. No. 42, pp. 13–14).  In response, Plaintiff contends that "it is not clear that

Defendant had the financial resources at any relevant time to meet the loss that might flow from

the concert being put on."  (Dkt. No. 38-2, p. 15).

In order to prove fraudulent inducement under New York law, a plaintiff must show: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 306 (S.D.N.Y. 2010) (internal quotation marks and citation omitted). Parallel fraud and contract claims may only be sustained in the same action if the plaintiff: "(1) demonstrates a legal duty separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007).

United States Magistrate Judge Christian F. Hummel previously denied Plaintiff leave to amend the Complaint to bolster its fraud allegations, finding that Plaintiff "failed to demonstrate that it may proceed with parallel contract and fraud claims." (Dkt. No. 36, p. 15). In a lengthy, cogent analysis, Magistrate Hummel scrutinized Plaintiff's proposed amendments and its theory of fraud, and concluded that it was duplicative of the contract claim:

> The alleged misrepresentations involve defendants' financial solvency, and, thus, its ability to proceed under the contract. The contract was, in essence, for a financial performance – to provide certain funds for artist deposits and to share in the resultant profit or loss. To hold that Scher's implicit misrepresentation(s) about MEC's financial resources, and, thus, ability to proceed under the contract, is separate from the breach of contract claim (i.e., defendants' inability or refusal to financially perform under the contract), would be an "absurd" result.
>
> * * * *
>
> It cannot be said that defendants misrepresenting their ability to financially perform under the contract is collateral to the contract itself, as the primary subject of the contract was for defendants to provide financial support for the concert.
>
> * * * *
>
> The alleged misrepresentation here is defendants' financial solvency, and, thus, ability to complete the contract. Plaintiff's injuries flowed from defendants' failure

to perform under the terms of the contract, something that cannot be distinguished from Scher's failure to disclose MEC's financial insolvency.

\* \* \* \*

Plaintiff's allegations that defendants made misrepresentations about their financial solvency and, thus, ability to financially perform under the contract state nothing more than a breach of the promise to perform under the terms of the contract

\* \* \* \*

Indeed, it is clear that plaintiff's alleged injuries flowed from defendants' "failure to do what it had contracted to do," which cannot [be] reasonably said to be sufficiently distinct from its alleged misrepresentations of its financial solvency.

(*Id.*, pp. 18–22). After careful review of the record, the Court finds that Plaintiff cannot maintain its parallel fraud claims. As discussed above, the gravamen of this case is breach of contract. Plaintiff's theory of fraud is so intertwined with the contract, both factually and legally, that it is impossible to separate an independent claim, for the reasons explained by Magistrate Hummel. Accordingly, Plaintiff's fraud claims must be dismissed. *See FPP, LLC v. Xaxis US, LLC*, 764 F. App'x 92, 94 (2d Cir. 2019) (affirming dismissal of fraud claim that was "duplicative" of breach of contract claim). !

## C.  Debtor & Creditor Law

Plaintiff's fifth and sixth claims allege that Defendants violated Article 10 of New York's Debtor and Creditor Law, Sections 273, 275, and 276. (Dkt. No. 1, ¶¶ 60–77). Specifically, Plaintiff alleges that Defendants' conduct "in incurring such debts and engaging in a business transaction with insufficient capital is a violation of NY Debtor and Creditor Law Sections 273 and 275 as constructively fraudulent without regard to intent." (*Id.*, ¶ 66). Further, Plaintiff alleges that Defendants "incurred the obligations of co-promoter of the Concert under the oral agreement and under the written Use License Agreement with an actual intent to hinder, delay or defraud creditors and specifically Plaintiff . . . in connection with the Concert events and the Concert date of January 26, 2018," in violation of Section 276. (*Id.*, ¶¶ 71, 73). Defendants

argue that these claims are duplicative of Plaintiff's other claims and thus should be dismissed. (Dkt. No. 37-3, pp. 15–17).  Plaintiff disagrees.  (Dkt. No. 38-2, pp. 14–17).

Article 10 of New York's Debtor and Creditor Law (§§ 270–281) provides causes of action for fraudulent conveyances.  *See Elgin Sweeper Co. v. Melson Inc.*, 884 F. Supp. 641, 648 (N.D.N.Y. 1995).  Sections 273, 275, and 276 cover both intentional and constructive fraud.  *Id.*  Therefore, Plaintiff's claims under the Debtor and Creditor Law fundamentally allege fraud related to the License Agreement.  (*See* Dkt. No. 38-2, p. 16) (recognizing that Plaintiff's claims "deal with the 'obligation' that Defendant assumed and undertook to act as co-promoter under the Use License Agreement").  However, these claims, like those for fraudulent inducement, are subsumed by Plaintiff's breach of contract claim, as discussed above.  Accordingly, they too must be dismissed.

## V.    SANCTIONS

Finally, the Court turns to Defendants' Rule 11 motion for sanctions against Plaintiff. (Dkt. No. 48).  Defendants claim that Plaintiff concealed "critical documents" during discovery that cripple Plaintiff's case, which should be dismissed with prejudice.  (Dkt. No. 48-1). Defendants contend that these emails establish that Metropolitan *did not* cause the cancellation of the Concert.  (*Id.*, pp. 10–11).  Plaintiff responds that it acted in good faith, did not conceal the emails, its claims still have merit, and that sanctions are not warranted.  (Dkt. No. 49-11).

Rule 11 of the Federal Rules of Civil Procedure states in relevant part that by presenting to the court a pleading, written motion, or other paper, an attorney certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b).  "Rule 11(c) of the Federal Rules of Civil Procedure allows the court to sanction a party, if the court determines that the party has violated Rule 11(b) by making false, misleading, improper, or frivolous representations to the court." *Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 51 (2d Cir. 2008).  A sanction imposed under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4).  "Such sanctions may be nonmonetary as well as monetary, and can include dismissal."  *Dome Pat. L.P. v. Permeable Techs., Inc.*, 190 F.R.D. 88, 90 (W.D.N.Y. 1999).

"The question of whether or not a signer of a filing has violated Rule 11 is determined by an objective standard of reasonableness."  *Zlotnick v. Hubbard*, 572 F. Supp. 2d 258, 272 (N.D.N.Y. 2008).  Under the objective standard, in order to impose Rule 11 sanctions on the basis that a claim is frivolous and not grounded in fact or law, "it must be patently clear that a claim has absolutely no chance of success."  *Id.* at 273 (quotations omitted) (citing *Sussman v. Bank of Israel*, 56 F.3d 450, 457 (2d Cir. 1995)).  "The Court must examine the factual allegations, as well as the underlying legal principles to determine whether the claims were 'frivolous, unreasonable, or groundless' in light of controlling law."  *3H Enterprises, Inc. v. Dwyre*, 182 F. Supp. 2d 249, 262 (N.D.N.Y. 2001) (quoting *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 765, 770 (2d Cir. 1998)).  "Sanctions are committed to the discretion of the trial court."  *Id.*

Here, Defendants contend that Plaintiff commenced and continued this action despite knowing from the allegedly concealed emails that its claims were frivolous and lacked evidentiary support. (Dkt. No. 48-1). The emails in question are between Belber, the manager of SMG, and Taylor's manager Feldman. In one communication on January 16, 2018, Belber told Feldman that the Concert was facing a "staggering loss," and he asked Feldman to assist in lowering the artists' guarantees. (Dkt. No. 37-4, p. 1). In another email, after the initial cancellation of the Concert, Belber wrote to Feldman that "I think I can get my people to consider going forward" if Taylor agreed to $200,000, Legend agreed to $300,000, and Scher put up $100,000. (Dkt. No. 38-23, p. 2). Finally, on January 20, 2018, Belber and Feldman exchanged emails about the reduced fees and Belber said that 4:30 p.m. was the "drop dead deadline" for getting everyone on board. (Dkt. No. 37-16, p. 1). Even after the deadline, when Legend belatedly agreed, Belber wanted to move forward with the Concert and he asked Feldman to go back to Taylor, but Feldman declined. (Dkt. No. 37-18, p. 3).

According to Defendants, Plaintiff concealed the emails "until the Feldman document production and Feldman's deposition in this case." (Dkt. No. 48-1, p. 8). Defendants contend that the emails show that "the sole cause for the Concert's cancellation was Feldman's refusal to have his client perform and blaming that decision on Plaintiff's rash behavior in repeatedly cancelling the Concert, establishing an artificial deadline to cancel the Concert, thus causing Feldman to lose faith in Plaintiff's ability to stage the Concert." (*Id.*, pp. 10–11). In response, Plaintiff states that it "provided significant disclosure and has endeavored at every step to act in good faith," and that the emails amount to "at best, an inadvertent failure to locate documents." (Dkt. No. 38-1, ¶¶ 38, 41–42). Belber states that when SMG decided to file suit, he searched his emails "using as many key words as I could think of to gather materials for my attorney to use in

preparing the Complaint."  (Dkt. No. 53, ¶ 31).  Belber adds that "[a]s the case progressed and my counsel asked me specific questions, I made further searches of my electronic records and I did find additional documents and sent them on to my attorney who, to my understanding, then provided them to Defendants' counsel."  (*Id.*, ¶ 32).  According to Belber, "[t]here was never any intention to deceptively withhold any relevant documents whatsoever."  (*Id.*, ¶ 33).

Based on the sworn statements of Belber and Plaintiff's counsel, the Court is satisfied that they acted in good faith and did not deliberately conceal the emails in question.  In any event, the emails are not fatal to Plaintiff's case.  The Court considered the entire record, including the emails, in finding that Metropolitan breached the License Agreement.  And as discussed above, causation and damages must be resolved at trial.  Accordingly, Plaintiff's claim for breach of contract was not objectively frivolous, unreasonable, or groundless, and Defendants' motion for sanctions must be denied.

## VI.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for judgment on the pleadings or alternatively summary judgment (Dkt. No. 37) is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiff's claims for fraudulent inducement and violations of New York Debtor and Creditor Law (Claims Two, Three, Four, Five, and Six) are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants John Scher, John Doe #1, and John Doe #2 are dismissed from this case; and it is further

**ORDERED** that Defendants' request for leave to amend the Answer to add the defense of novation is **DENIED as futile**; and it is further

**ORDERED** that Plaintiff's cross-motion for partial summary judgment (Dkt. No. 39) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court shall schedule a trial on Plaintiff's claim for breach of contract against Defendant Metropolitan, limited to the issue of damages; and it is further

**ORDERED** that Defendants' motion for sanctions (Dkt. No. 48) is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 3, 2021
       Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge